## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| JERRY BLADES, individually, and on behalf of all others similarly situated, | Case No. |
| Plaintiff, | |
| v. | **CLASS ACTION** |
| FINANCIAL INSTITUTION SERVICE CORPORATION, HOMELAND BANCSHARES, INC., PROGRESS SOFTWARE CORPORATION, and IPSWITCH, INC., | **JURY TRIAL DEMANDED** |
| Defendants. | |

## **CLASS ACTION COMPLAINT**

Plaintiff Jerry Blades ("Plaintiff"), on behalf of himself and all others similarly situated (collectively, "Class members"), by and through his attorneys, bring this Class Action Complaint against Financial Institution Service Corporation ("FISC"), Homeland Bancshares, Inc. ("Homeland Bank"), Progress Software Corporation ("PSC"), and Ipswitch, Inc. ("Ipswitch") (collectively, "Defendants") and complains and alleges upon personal knowledge as to himself and information and belief as to all other matters.

## **INTRODUCTION**

1.     Plaintiff brings this class action against Defendants for their failure to secure and safeguard his and approximately 1,359,260 other similarly situated individuals' personally identifiable information ("PII"), including but not limited to names, addresses, dates of birth, Social Security numbers, driver's license numbers and other government issued identification numbers, financial account information, telephone numbers, and credit and/or debit card numbers.

1

2.      Homeland Bank is a bank with four branches in Central and North Louisiana. Homeland Bank contracts with FISC for technological services and provides FISC with its customers' PII. FISC transferred Homeland Bank's, and other financial institution's, customers' PII through Ipswitch and PSC's MOVEit Transfer software. Plaintiff's and Class members' PII was disclosed to unauthorized third parties during a massive data breach compromising the MOVEit Transfer and MOVEit Cloud ("MOVEit") software that occurred between approximately May 27, 2023 and May 31, 2023 (the "Data Breach").

3.      During the Data Breach, and due to Defendants' data security and privacy shortcomings, unauthorized persons were able to gain access to files containing the PII of FISC's and Homeland Bank's customers by exploiting a vulnerability in the MOVEit platform.

4.      Defendants owed a duty to Plaintiff and Class members to implement and maintain reasonable and adequate security measures to secure, protect, and safeguard their PII against unauthorized access and disclosure. Defendants breached that duty by, among other things, failing to implement and maintain reasonable security procedures and practices to protect their PII from unauthorized access and disclosure.

5.      As a result of Defendants' inadequate security measures and breach of their duties and obligations, the Data Breach occurred, and Plaintiff's and Class members' PII was accessed and disclosed. This action seeks to remedy these failings and their consequences. Plaintiff brings this action on behalf of himself and all of FISC's clients' customers whose PII was exposed as a result of the Data Breach.

6.      Plaintiff, on behalf of himself and all other Class members, asserts claims for negligence, breach of fiduciary duty, and unjust enrichment, and seek declaratory relief, injunctive

relief, monetary damages, statutory damages, punitive damages, equitable relief, and all other relief authorized by law.

## PARTIES

### *Plaintiff Jerry Blades*

7.     Plaintiff Jerry Blades is a citizen of the State of Louisiana.

8.     Plaintiff Blades was required to provide his PII to Homeland Bank in connection with obtaining financial services.

9.     Based on representations made by Homeland Bank and relied upon by Plaintiff, Plaintiff Blades believed that Homeland Bank had implemented and maintained reasonable security and practices to protect his PII, including ensuring third parties it contracts with and shares PII with maintain adequate data security and practices.

10.     In connection with providing banking or other financial services to Plaintiff, Homeland Bank collected, maintained, and shared Plaintiff's PII on its systems and to its vendors, including FISC.

11.     Had Plaintiff known that Defendants do not adequately protect the PII in their possession, including Homeland Bank and FISC by not ensuring that the third parties it contracts with in relation to providing banking or financial services to customers maintain adequate data security systems and practices, he would not have agreed to provide his PII to Homeland Bank.

12.     Plaintiff received a letter from FISC notifying him that his PII was exposed in the Data Breach.

13.     As a direct result of the Data Breach, Plaintiff has suffered injury and damages including, *inter alia*: a substantial and imminent risk of identity theft; the wrongful disclosure and

loss of confidentiality of his highly sensitive PII; deprivation of the value of his PII; and overpayment for services that did not include adequate data security.

### Defendant Financial Institution Service Corporation

14.     Defendant Financial Institution Service Corporation is a Louisiana corporation with its principal place of business located at 500 Pavilion Road, West Monroe, Louisiana 71292-9490. It may be served through its registered agent: Patrick L. Spencer, 500 Pavilion Road, West Monroe, Louisiana 71292-9490.

### Defendant Homeland Bancshares, Inc.

15.     Defendant Homeland Bancshares, Inc. is a Louisiana corporation with its principal place of business located at 7840 Highway 165 South, Columbia, Louisiana 71418. It may be served through its registered agent: Ronnie Darden, 276 Woodland Drive, Columbia, Louisiana 71418.

### Defendant Progress Software Corporation

16.     Defendant Progress Software Corporation is a Delaware corporation with a principal place of business located at 15 Wayside Road, Suite 4, Burlington, MA 01803. It may be served through its registered agent: Corporation Service Company, 84 State St., Boston, MA 02109.

### Defendant Ipswitch, Inc.

17.     Defendant Ipswitch, Inc. is a Massachusetts for profit corporation with its principal place of business located at 15 Wayside Road, 4th Floor, Burlington, MA 01803.

## <u>JURISDICTION AND VENUE</u>

18.     The Court has subject matter jurisdiction over Plaintiff's claims under 28 U.S.C. § 1332(d)(2), because (a) there are 100 or more Class members, (b) at least one Class member is a

citizen of a state that is diverse from Defendants' citizenship, and (c) the matter in controversy exceeds $5,000,000, exclusive of interest and costs. Further, greater than two-thirds of the Class Members reside in states other than the states in which Defendants are citizens.

19.     The Court has personal jurisdiction over Defendants FISC and Homeland Bank because they are Louisiana corporations, have their principal places of business in Louisiana, and transact significant business in Louisiana.

20.     The Court has personal jurisdiction over Defendants Ipswitch, Inc. and Progress Software Corporation because Defendants transact significant business in Louisiana, and otherwise have sufficient minimum contacts with and intentionally avail themselves of the markets in Louisiana through their promotion, marketing, and sale of MOVEit software and other software, products, and related services.

21.     Venue properly lies in this judicial district because, *inter alia,* FISC's and Homeland Bank's principal places of business are located in this District, Defendants transact substantial business in this District, and a substantial part of the conduct giving rise to Plaintiff's claims occurred in this District.

## FACTUAL ALLEGATIONS

### *Ipswitch, Inc., Progress Software, and the Unsecure MOVEit Software*

22.     Ipswitch is an IT software development company founded in 1991 in Burlington, Massachusetts. Ipswitch sells its software and related products and services, including MOVEit solutions, directly and through resellers and distributors in the United States.

23.     Defendant PSC, a public domestic software company based in Massachusetts, acquired Ipswitch in May 2019 for approximately $225 million.

24.    Ipswitch developed and through PSC sells the MOVEit software, which they claim is "the leading secure Managed File Transfer (MFT) software used by thousands of organizations around the world to provide complete visibility and control over file transfer activities."[1]

25.    On their websites, Defendants Ipswitch and PSC make a host of claims about data security and their MOVEit product. Ipswitch claims, generally, that its "Enterprise File Transfer Solutions – Mak[e] the networked world a safer place."[2] Its website states: "Our efficient, easy-to-use products empower customers to respond faster to business demands through accelerated implementation and improved productivity and security."[3]

26.    Specific to MOVEit, Ipswitch claims that "MOVEit enables your organization to meet compliance standards, easily ensure the reliability of core business processes, and secure the transfer of sensitive data between partners, customers, users and systems." [4] Ipswitch claims its MOVEit Transfer and MOVEit Cloud products give customers "control" over their businesses; "provides full security, reliability and compliance"; provide "encryption, security, activity tracking tamper-evident logging, and centralized access controls to meet your operational requirements"; "[r]eliably and easily comply with SLAs, internal governance requirements and regulations like PCI, HIPAA, CCPA/CPRA and GDPR"; and provide "secure and managed file transfer."[5]

27.    PSC makes similar statements about data security. Its website claims "MOVEit provides secure collaboration and automated file transfers of sensitive data" and that it provides

---

[1] *MOVEit*, Ipswitch, https://www.ipswitch.com/moveit (last accessed Oct. 11, 2023).

[2] *Ipswitch.com*, Ipswitch, https://www.ipswitch.com (last accessed Oct. 11, 2023).

[3] *Id.*

[4] *See MOVEit*, *supra* note 1.

[5] *Id.*

"[e]ncryption and activity tracking enable compliance with regulations such as PCI, HIPAA and GDPR."[6]

28.    PSC also touts all of the following on its website regarding MOVEit:[7]

# Securely Share Files Across the Enterprise and Globally

Reduce the risk of data loss and non-compliance with a fully-auditable and managed file transfer solution. Extend file transfer capabilities to all users to eliminate insecure use of email and quickly onboard partners and third-parties. Easily create automated file transfer tasks and workflows to accelerate your business and eliminate the risk of user error. Track and report on every single transfer.

✓ **Transfer Sensitive Information Securely**

Encryption in-transit and at-rest and advanced security features keep sensitive information out of harm's way.

✓ **Assure Regulatory Compliance**

Easily implement security controls and establish an audit trail.

✓ **Let End Users Collaborate Securely**

Easily ensure secure and compliant sharing of sensitive data for all users.

✓ **Accelerate Task and Workflow Creation**

Enable your team with programming-free automation of multi-step, logic-based workflows.

29.    As demonstrated above, Defendants Ipswitch and PSC heavily tout and promote the MOVEit products and services as capable of safely transferring sensitive information. Despite these assurances and claims, Defendants Ipswitch and PSC failed to offer safe and secure file transfer products and failed to adequately protect Plaintiff's and Class members' PII.

30.    This is because the products that Defendants Ipswitch and PSC offered, and which FISC used, were not secure. When the Data Breach occurred, there was a critical vulnerability in the MOVEit software referred to as CVE-2023-34362. Specifically, Defendants Ipswitch and PSC identified that MOVEit's web-based front end is affected by a critical structured query language

---

[6] *MOVEit*, PSC, https://www.progress.com/moveit (last accessed Oct. 11, 2023).

[7] *Id*.

(SQL) injection vulnerability/attack vector that can be exploited by an unauthenticated attacker to access databases associated with the product.

31.    All of the Defendants knew or should have known that MOVEit leaves the PII of FISC's and Homeland Bank's customers, including Plaintiff and Class members, exposed to security threats. Despite this, Ipswitch and PSC continued to offer MOVEit file transfer products without adequately testing and identifying the vulnerabilities in the products, and patching or otherwise eliminating those threats.

32.    Similarly, FISC continued to use the MOVEit software without adequately ensuring it was secure and that Ipswitch and PSC had adequate data security systems and practices in place to protect Plaintiff and Class members' PII. As one cybersecurity company noted, "Just because a piece of software claims to be 'secure' doesn't mean that it is. Customers must always validate that the software they use is secure, and is configured in a way that can protect against cyberattacks."[8]

### Homeland Bank and FISC

33.    Homeland Bank was founded in 1986 and claims that its "complete choice of services will take care of your banking needs."[9] The company has locations in Columbia, Jena, Monroe, and West Monroe.[10]

---

[8] Avishai Avivi, *MOVEIt Vulnerability: A Painful Reminder That Threat Actors Aren't the Only Ones Responsible for a Data Breach*, SAFEBREACH (June 21, 2023), https://www.safebreach.com/moveit-vulnerability-a-painful-reminder-that-threat-actors-arent-the-only-ones-responsible-for-a-data-breach/.

[9] *History*, HOMELAND BANK, https://www.homelandbank.com/history# (last accessed Oct. 10, 2023).

[10] *Locations*, HOMELAND BANK, https://www.homelandbank.com/locations (last accessed Oct. 10, 2023).

34.     FISC is a "cooperative that services 60 member banks and employs around 65 full time people."[11] It states that its "primary market area is community banking focused, with banks ranging from 66 to 3,133 million in assets" and that its servicing area is "Alabama, Louisiana, Mississippi, Oklahoma, and Texas."[12]

35.     Homeland Bank maintains a privacy policy on its website that states, "We do NOT disclose any nonpublic personal information about you to anyone, except as permitted by law."[13] Homeland Bank's privacy policy goes on to state, "We restrict access to nonpublic personal information about you to those employees who need to know that information to provide products or services to you. We maintain physical, electronic, and procedural safeguards that comply with federal standards to guard your nonpublic personal information."[14]

36.     Homeland Bank shared Plaintiff's and Class members' PII with FISC, who then shared the PII with Ipswitch and PSC via the MOVEit software in connection with providing banking or other financial services to Plaintiff and Class members.[15] In doing so, Homeland Bank failed to ensure that FISC would adequately protect its customers' PII and FISC failed to ensure that Ipswitch and PSC implemented and maintained adequate data security practices to protect Plaintiff's and Class member's PII from unauthorized access, disclosure, and theft.

---

[11] *Who We Are*, FISC, https://fiscdp.com/who-we-are/ (last accessed Oct. 10, 2023).

[12] *Id.*

[13] *Homeland Bank's Privacy Policy*, HOMELAND BANK, https://www.homelandbank.com/privacy-statement (last accessed Oct. 10, 2023).

[14] *Id.*

[15] *See Financial Institution Service Corporation – Notice of Data Event – ME* ("Notice Letter"), Office of the Maine Attorney General, https://apps.web.maine.gov/online/aeviewer/ME/40/8b40a1e9-5dc0-40c2-8264-67f611ad5d9e/099f420b-5f61-4bdf-845f-d1a028883deb/document.html.

*The Data Breach*

37.     Between approximately May 27 and May 31, 2023, unauthorized persons exploited a vulnerability in the MOVEit software to access and download files containing the sensitive PII of Plaintiff and Class Members.[16]

38.     According to reports, the Clop (also known as CLOP or Cl0p) ransomware gang is responsible for the attack on the MOVEit platform.[17]

39.     On or about May 31, 2023, PSC and Ipswitch alerted their customers, including FISC, about a critical vulnerability in the MOVEit software and the Data Breach. Despite this, FISC waited until approximately September 22, 2023, almost four months later, to begin notifying its customers of the Data Breach.[18]

40.     The Cybersecurity and Infrastructure Security Agency (CISA) and the FBI first warned on June 7, 2023, that the Clop ransomware gang was exploiting a vulnerability in MOVEit Transfer. "Internet-facing MOVEit Transfer web applications were infected with a specific malware used by CL0P, which was then used to steal data from underlying MOVEit Transfer databases," the advisory said, as it explained how threat actors carried out the attack.[19]

---

[16] *Id.*

[17] *See Clop Gang to Earn Over $75 Million from MOVEit Extortion Attacks*, Bleeping Computer (July 21, 2023, 12:34 PM), https://www.bleepingcomputer.com/news/security/clop-gang-to-earn-over-75-million-from-moveit-extortion-attacks/.

[18] *See* Notice Letter, *supra* note 15.

[19] Bruce Sussman, *Clop Ransomware and the MOVEit Cyberattack: What to Know*, BLACKBERRY BLOG (June 19, 2023), https://blogs.blackberry.com/en/2023/06/clop-ransomware-and-moveit-cyberattack.

41.    A senior CISA officer informed reporters that "several hundred" businesses and organizations in the United States may be impacted by the hacking campaign in addition to government entities.[20]

42.    As a result of the MOVEit Data Breach, Plaintiff and Class members have had their sensitive PII exposed as a result of Ipswitch and PSC's unsecure MOVEit file transfer product being exploited by cyber criminals during the Data Breach, and because Homeland Bank and FISC failed to ensure the third parties they contract with maintained adequate data security systems and practices.

***Defendants Knew that Criminals Target PII***

43.    At all relevant times, Defendants knew, or should have known, that the PII that they collected was a target for malicious actors. Despite such knowledge, Defendants failed to implement and maintain reasonable and appropriate data privacy and security measures to protect Plaintiff's and Class members' PII from cyber-attacks that Defendants should have anticipated and guarded against.

44.    It is well known among companies that store sensitive personally identifying information that such information—such as the Social Security numbers ("SSNs") and financial information stolen in the Data Breach—is valuable and frequently targeted by criminals. In a recent article, *Business Insider* noted that "[d]ata breaches are on the rise for all kinds of businesses,

---

[20] Onur Demirkol, *US Government Under Seige: MOVEit Breach Exposes Critical Data to Ruthless Clop Ransomware Attack*, DATA CONOMY (June 19, 2023), https://dataconomy.com/2023/06/19/moveit-breach-data-clop-ransomware/ (last accessed Oct. 11, 2023).

including retailers …. Many of them were caused by flaws in … systems either online or in stores."[21]

45.    PII is a valuable property right.[22] "Firms are now able to attain significant market valuations by employing business models predicated on the successful use of personal data within the existing legal and regulatory frameworks."[23] American companies are estimated to have spent over $19 billion on acquiring personal data of consumers in 2018.[24] It is so valuable to identity thieves that once PII has been disclosed, criminals often trade it on the "cyber black-market," or the "dark web," for many years.

46.    As a result of the real and significant value of these data, identity thieves and other cyber criminals have openly posted credit card numbers, SSNs, PII, and other sensitive information directly on various Internet websites making the information publicly available. This information from various breaches, including the information exposed in the Data Breach, can be readily aggregated with other such data and become more valuable to thieves and more damaging to victims.

---

[21] Dennis Green, Mary Hanbury & Aine Cain, *If you bought anything from these 19 companies recently, your data may have been stolen*, BUSINESS INSIDER (Nov. 19, 2019, 8:05 A.M.), https://www.businessinsider.com/data-breaches-retailers-consumer-companies-2019-1.

[22] *See* Marc van Lieshout, *The Value of Personal Data*, 457 International Federation for Information Processing 26 (May 2015) ("The value of [personal] information is well understood by marketers who try to collect as much data about personal conducts and preferences as possible…"), https://www.researchgate.net/publication/283668023_The_Value_of_Personal_Data.

[23] OECD, *Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value*, OECD iLIBRARY (April 2, 2013), https://www.oecd-ilibrary.org/science-and-technology/exploring-the-economics-of-personal-data_5k486qtxldmq-en.

[24] IAB Data Center of Excellence, *U.S. Firms to Spend Nearly $19.2 Billion on Third-Party Audience Data and Data-Use Solutions in 2018, Up 17.5% from 2017*, IAB.COM (Dec. 5, 2018), https://www.iab.com/news/2018-state-of-data-report/.

47.    Consumers place a high value on the privacy of their data, as they should. Researchers shed light on how much consumers value their data privacy—and the amount is considerable. Indeed, studies confirm that "when privacy information is made more salient and accessible, some consumers are willing to pay a premium to purchase from privacy protective websites."[25]

48.    Given these facts, any company that transacts business with a consumer and then compromises the privacy of consumers' PII has thus deprived that consumer of the full monetary value of the consumer's transaction with the company.

### Theft of PII Has Grave and Lasting Consequences for Victims

49.    Theft of PII can have serious consequences for the victim. The FTC warns consumers that identity thieves use PII to receive medical treatment, start new utility accounts, and incur charges and credit in a person's name.[26] [27]

50.    Experian, one of the largest credit reporting companies in the world, warns consumers that "[i]dentity thieves can profit off your personal information" by, among other things, selling the information, taking over accounts, using accounts without permission, applying

---

[25] Janice Y. Tsai et al., *The Effect of Online Privacy Information on Purchasing Behavior*, *An Experimental Study*, 22(2) INFO. SYS. RSCH. 254 (June 2011) https://www.jstor.org/stable/23015560?seq=1.

[26] *See* Federal Trade Commission, *What to Know About Identity Theft*, FED. TRADE COMM'N CONSUMER INFO., https://www.consumer.ftc.gov/articles/what-know-about-identity-theft (last accessed Oct. 11, 2023).

[27] The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority." 12 C.F.R. § 1022.3(h). The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, social security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number." 12 C.F.R. § 1022.3(g).

for new accounts, obtaining medical procedures, filing a tax return, and applying for government benefits.[28]

51.    Identity theft is not an easy problem to solve. In a survey, the Identity Theft Resource Center found that almost 20% of victims of identity misuse needed more than a month to resolve issues stemming from identity theft.[29]

52.    Theft of SSNs also creates a particularly alarming situation for victims because SSNs cannot easily be replaced. In order to obtain a new SSN, a breach victim has to demonstrate ongoing harm from misuse of her SSN. Thus, a new SSN will not be provided until after the harm has already been suffered by the victim.

53.    Due to the highly sensitive nature of SSNs, theft of SSNs in combination with other PII (e.g., name, address, date of birth) is akin to having a master key to the gates of fraudulent activity. TIME quotes data security researcher Tom Stickley, who is employed by companies to find flaws in their computer systems, as stating, "If I have your name and your Social Security number and you don't have a credit freeze yet, you're easy pickings."[30]

54.    There may also be time lags between when sensitive personal information is stolen, when it is used, and when a person discovers it has been used. On average it takes approximately

---

[28] *See* Louis DeNicola, *What Can Identity Thieves Do with Your Personal Information and How Can You Protect Yourself*, EXPERIAN (May 21, 2023), https://www.experian.com/blogs/ask-experian/what-can-identity-thieves-do-with-your-personal-information-and-how-can-you-protect-yourself/.

[29] Identity Theft Resource Center, *2023 Consumer Aftermath Report*, IDENTITY THEFT RES. CTR. (2023), https://www.idtheftcenter.org/publication/2023-consumer-impact-report/ (last accessed Oct. 11, 2023).

[30] Patrick Lucas Austin, *'It Is Absurd.' Data Breaches Show it's Time to Rethink How We Use Social Security Numbers, Experts Say*, TIME (August 5, 2019), https://time.com/5643643/capital-one-equifax-data-breach-social-security/.

three months for consumers to discover their identity has been stolen and used, but it takes some individuals up to three years to learn that information.[31]

55.    It is within this context that Plaintiff and Class members must now live with the knowledge that their PII is forever in cyberspace, having been stolen by criminals willing to use the information for any number of improper purposes and scams, including making the information available for sale on the black market.

### Damages Sustained by Plaintiff and Class Members

56.    Plaintiff and Class members have suffered injury and damages, including, but not limited to: (i) a substantially increased risk of identity theft—risk which justifies or necessitates expenditures for protective and remedial services, for which they are entitled to compensation; (ii) improper disclosure of their PII; (iii) breach of the confidentiality of their PII; (iv) deprivation of the value of their PII, for which there is a well-established national and international market; (v) lost time and money incurred to mitigate and remediate the effects of the Data Breach, including the increased risk of identity theft they face and will continue to face; and (vi) overpayment for the services that were received without adequate data security.

### <u>CLASS ALLEGATIONS</u>

57.    This action is brought and may be properly maintained as a class action pursuant to Federal Rule of Civil Procedure 23.

58.    Plaintiff brings this action on his own behalf, and on behalf of the following Class of similarly situated persons:

>   All persons whose personally identifiable information was provided to Financial Institution Services Corporation and was accessed in the Data

---

[31] John W. Coffey, *Difficulties in Determining Data Breach Impacts*, 17 J. OF SYSTEMICS, CYBERNETICS AND INFORMATICS 9 (2019), http://www.iiisci.org/journal/pdv/sci/pdfs/IP069LL19.pdf.

Breach by unauthorized persons, including all who were sent a notice of the Data Breach.

59.     Plaintiff also brings this action on behalf of a subclass of Homeland Bank customers whose PII was affected in the Data Breach (the "Homeland Bank Subclass"):

> All persons whose personally identifiable information was provided to Homeland Bancshares, Inc. and was accessed in the Data Breach by unauthorized persons, including all who were sent a notice of the Data Breach.

60.     Excluded from the Class are: (i) Defendant Ipswitch, Inc. and its affiliates, parents, subsidiaries, officers, agents, directors, legal representatives, successors, subsidiaries, and assigns; (ii) Defendant Progress Software Corporation and its affiliates, parents, subsidiaries, officers, agents, directors, legal representatives, successors, subsidiaries, and assigns; (iii) Defendant Financial Institution Service Corporation and its affiliates, parents, subsidiaries, officers, agents, directors, legal representatives, successors, subsidiaries, and assigns; (iv) Defendant Homeland Bancshares, Inc. and its affiliates, parents, subsidiaries, officers, agents, directors, legal representatives, successors, subsidiaries, and assigns; and (v) the judge(s) presiding over this matter and the clerks of said judge(s).

61.     Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of his claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

62.     The members of the Class are so numerous that joinder of all Class members in a single proceeding would be impracticable. FISC has reported the number of persons affected by the Data Breach as 1,359,260 persons through four submissions to the Maine Attorney General.[32]

---

[32] https://apps.web.maine.gov/online/aeviewer/ME/40/21df7004-999d-4dfd-bbdd-e9ea4431c2e8.shtml; https://apps.web.maine.gov/online/aeviewer/ME/40/b6244db6-854f-4582-

63.     Common questions of law and fact exist as to all Class Members and predominate over any potential questions affecting only individual Class Members. Such common questions of law or fact include, inter alia:

    a.    whether Defendants had a duty to implement and maintain reasonable security procedures and practices to protect and secure Plaintiff's and Class members' PII from unauthorized access and disclosure, including ensuring that the third parties it contracts with to provide services had adequate data security measures in place;

    b.    whether Defendants failed to exercise reasonable care to secure and safeguard Plaintiff's and Class members' PII';

    c.    whether an implied contract existed between Class members and Defendants, providing that Defendants would implement and maintain reasonable security measures to protect and secure Class members' PII from unauthorized access and disclosure;

    d.    whether Defendants breached their duties to protect Plaintiff's and Class members' PII; and

    e.    whether Plaintiff and Class members are entitled to damages and the measure of such damages and relief.

64.     Defendants engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiff, on behalf of himself and all other Class members. Individual questions, if any, pale in comparison, in both quantity and quality, to the numerous common questions that dominate this action.

65.     Plaintiff's claims are typical of the claims of the Class. Plaintiff, like all proposed members of the Class, had his PII compromised in the Data Breach. Plaintiff and Class members were injured by the same wrongful acts, practices, and omissions committed by Defendants, as

---

88d7-d9d13ad4aaee.shtml; https://apps.web.maine.gov/online/aeviewer/ME/40/e3b3f59d-b2de-44be-92b5-cf78b7b622b0.shtml; https://apps.web.maine.gov/online/aeviewer/ME/40/5e384a87-d132-4513-81d5-0efd8ef92509.shtml.

described herein. Plaintiff's claims therefore arise from the same practices or course of conduct that give rise to the claims of all Class members.

66.   Plaintiff will fairly and adequately protect the interests of the Class members. Plaintiff is an adequate representative of the Class in that he has no interests adverse to, or that conflict with, the Class he seeks to represent. Plaintiff has retained counsel with substantial experience and success in the prosecution of complex consumer protection class actions of this nature.

67.   A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages and other financial detriment suffered by Plaintiff and Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendants, so it would be impracticable for Class members to individually seek redress from Defendants' wrongful conduct. Even if Class members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## CAUSES OF ACTION

### COUNT I
### NEGLIGENCE

68.   Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

69.     Defendants owed a duty to Plaintiff and Class members to exercise reasonable care in safeguarding and protecting their PII in their possession, custody, or control.

70.     Defendants knew or should have known the risks of collecting and storing Plaintiff's and Class members' PII and the importance of maintaining secure systems, including ensuring third party vendors employed adequate data security practices. Defendants knew or should have known that they faced an increased threat of customer data theft, as judged by the many data breaches that have targeted companies that stored PII in recent years.

71.      Given the nature of Defendants' businesses, the sensitivity and value of the PII they collect, store, and maintain, and the resources at their disposal, Defendants should have taken care to identify the vulnerabilities to their systems or to their third-party vendors' systems and prevented the Data Breach from occurring.

72.     Defendants breached these duties by failing to exercise reasonable care in safeguarding and protecting Plaintiff's and Class members' PII by failing to, or contracting with companies that failed to, design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems to safeguard and protect PII entrusted to them—including Plaintiff's and Class members' PII.

73.     It was reasonably foreseeable to Defendants that their failure to exercise reasonable care in safeguarding and protecting Plaintiff's and Class members' PII by failing to, or contracting with companies that failed to, design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems would result in the unauthorized

release, disclosure, and dissemination of Plaintiff's and Class members' PII to unauthorized individuals.

74.    But for Defendants' negligent conduct or breach of the above-described duties owed to Plaintiff and Class members, their PII would not have been compromised.

75.    As a result of Defendants' above-described wrongful actions, inaction, and want of ordinary care that directly and proximately caused the Data Breach, Plaintiff and Class members have suffered and will suffer injury, including, but not limited to: (i) a substantially increased and imminent risk of identity theft; (ii) the compromise, publication, and theft of their PII; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from unauthorized use of their PII; (iv) lost opportunity costs associated with efforts attempting to mitigate the actual and future consequences of the Data Breach; (v) the continued risk to their PII which remains in Defendants' possession; (vi) future costs in terms of time, effort, and money that will be required to prevent, detect, and repair the impact of the PII compromised as a result of the Data Breach; (vii) loss of value of the PII that was compromised in the Data Breach; and (viii) overpayment for the services that were received without adequate data security.

**COUNT II**
**BREACH OF FIDUCIARY DUTY**
**Against Homeland Bank on Behalf of the Homeland Bank Subclass**

76.    Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

77.    Plaintiff brings this claim only against Homeland Bank on behalf of the Homeland Bank Subclass.

78.    Plaintiff and Homeland Bank Subclass members gave Homeland Bank their PII in confidence, believing that Homeland Bank would protect that information. Plaintiff and

Homeland Bank Subclass members would not have provided Homeland Bank with this information had they known it would not be adequately protected.

79.     Homeland Bank's acceptance and storage of Plaintiff's and Homeland Bank Subclass members' PII created a fiduciary relationship between Homeland Bank and Plaintiff and Homeland Bank Subclass members. In light of this relationship, Homeland Bank must act in good faith primarily for the benefit of its customers, which includes safeguarding and protecting Plaintiff's and Homeland Bank Subclass members' PII.

80.     Due to the nature of the relationship between Homeland Bank and Plaintiff and Homeland Bank Subclass members, Plaintiff and Homeland Bank Subclass members were entirely reliant upon Homeland Bank to ensure that their PII was adequately protected. Plaintiff and Class members had no way of verifying or influencing the nature and extent of Homeland Bank's data security policies and practices or the extent to which it ensured that the third parties it contracts with and shares PII with maintained adequate data security practices and protocols, and Homeland Bank was in an exclusive position to guard against the Data Breach.

81.     Homeland Bank has a fiduciary duty to act for the benefit of Plaintiff and Homeland Bank Subclass members upon matters within the scope of their relationship. It breached that duty by, among other things, failing to properly safeguard Plaintiff's and Homeland Bank Subclass members' PII that it collected, failing to ensure Plaintiff's and Homeland Bank Subclass members' PII was shared with entities with adequate data protection systems and measures in place, and failing to notify Plaintiff and Homeland Bank Subclass members of the Data Breach in a timely manner.

82.     As a direct and proximate result of Homeland Bank's breaches of its fiduciary duties, Plaintiff and Homeland Bank Subclass members have suffered and will suffer injury, including, but not limited to: (i) a substantial increase in the likelihood of identity theft; (ii) the compromise and theft of their PII; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from unauthorized use of their PII; (iv) lost opportunity costs associated with effort attempting to mitigate the actual and future consequences of the Data Breach; (v) the continued risk to their PII which remains in Defendants' possession; (vi) future costs in terms of time, effort, and money that will be required to prevent, detect, and repair the impact of the PII compromised as a result of the Data Breach; and (vii) overpayment for the services that were received without adequate data security.

**COUNT III**
**UNJUST ENRICHMENT**

83.     Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

84.     Plaintiff and Class members conferred a monetary benefit upon Defendants in the form of their valuable PII and through money paid for services, a portion of which Plaintiff and Class members reasonably expected would be used to protect their PII.

85.     Defendants accepted or had knowledge of the benefits conferred upon them by Plaintiff and Class members by storing or transferring the PII, or otherwise using it to facilitate their business, and providing services to Plaintiff and Class members.

86.     As a result of Defendants' conduct, Plaintiff and Class members suffered actual damages in an amount equal to the loss of value of Plaintiff's and Class members' PII. Plaintiff and Class members also suffered actual damages in an amount equal to the difference in value between their payments made with reasonable data privacy and security practices and procedures

that Plaintiff and Class members paid for, and those payments without reasonable data privacy and security practices and procedures that they received.

87.     Defendants should not be permitted to retain the money belonging to Plaintiff and Class members because Defendants failed to adequately implement the data privacy and security procedures for themselves that Plaintiff and Class members paid for and that were otherwise mandated by federal, state, and local laws and industry standards. Defendants should be compelled to provide for the benefit of Plaintiff and Class members all unlawful proceeds received by them as a result of the conduct and Data Breach alleged herein.

## PRAYER FOR RELIEF

Plaintiff, individually and on behalf of the Class, by and through undersigned counsel, respectfully requests that the Court grant the following relief:

A.      Certify this case as a class action pursuant to Fed. R. Civ. P. 23, and appoint Plaintiff as class representative and undersigned counsel as class counsel;

B.      Award Plaintiff and Class members actual and statutory damages, punitive damages, and monetary damages to the maximum extent allowable;

C.      Award declaratory and injunctive relief as permitted by law or equity to assure that Class members have an effective remedy, including enjoining Defendants from continuing the unlawful practices as set forth above;

D.      Award Plaintiff and Class members pre-judgment and post-judgment interest to the maximum extent allowable;

E.      Award Plaintiff and Class members reasonable attorneys' fees, costs, and expenses, as allowable; and

    F.     Award Plaintiff and Class members such other favorable relief as allowable under law or at equity.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury on all issues so triable.


Dated: October 17, 2023

Respectfully submitted,

/s/J. Marc Vezina
J. MARC VEZINA, T.A.
LA Bar No. 24683
KELLI M. KHALAF
LA Bar No. 23213
**VEZINA AND GATTUSO, LLC**
401 Weyer St, P.O. Box 461
Gretna, LA 70054
Tel: (504) 368-5223
jmv@vezinalaw.com
kkhalaf@vezinagattuso.com


Ben Barnow*
Anthony L. Parkhill*
**BARNOW AND ASSOCIATES, P.C.**
205 West Randolph Street, Ste. 1630
Chicago, IL 60606
Tel: (312) 621-2000
b.barnow@barnowlaw.com
aparkhill@barnowlaw.com

*Counsel for Plaintiff and the Putative Class*

*pro hac vice forthcoming